**LIPPMANN et al. v. McGRATH, Atty. Gen., et al.**

**Civ. A. No. P–1017.**

United States District Court
S. D. Illinois, N. D.

Dec. 28, 1950.

Cassidy & Sloan, by John E. Cassidy and John F. Sloan, Jr., Peoria, Ill., for plaintiffs.

Howard L. Doyle, U. S. Atty., Marks Alexander, Asst. U. S. Atty., Springfield, Ill., Harry Weakley, Asst. U. S. Atty., Peoria, Ill., James D. Hill, Office of Alien Property, Dept. of Justice, Washington, D. C., Galbraith & Baymiller, Peoria, Ill., for defendants Alfs and Johnson, by Carroll Baymiller, Peoria.

ADAIR, District Judge.

The above cause having duly come on to be heard in its regular order on September 5, 6, and 7, 1950, upon the pleadings and proofs, and the court having heard the evidence adduced on behalf of the parties and having heard oral argument and examined the written briefs submitted by counsel and being fully advised and satisfied in the premises, now makes the following findings of fact and conclusions of law:

### Findings of Fact

1. The plaintiff, Moritz Walter Lippmann, was born at Chemnitz, Germany on August 3, 1903 and lived in Germany until 1926. He first arrived in the United States as a quota immigrant on May 13, 1926. He was employed as a shipping clerk at George Borgfeldt Co., New York City, from May 1926 until September 1926 and was employed as a production engineer at Hooven and Allison Company, Xenia, Ohio, from October 1926 until November 1930. At that time Hooven and Allison Company reduced its working force because of the depression and Lippmann resigned upon request of the company. Lippmann returned to Germany from March 1928 until May 1928 and, after the termination of his employment at Hooven and Allison Company, from November 1930 until February 1931.

2. The plaintiff, Mathilde Josefine Lippmann, was born Mathilde Josefine Walz at Stuttgart, Germany on January 13, 1904. She lived in Germany until 1928 and first arrived in the United States as a quota immigrant on November 14, 1928. The plaintiffs were married at Bloomington, Illinois on July 9, 1931.

3. Neither of the plaintiffs ever became a citizen of the United States. They were citizens of Germany by birth, and have always been and still are citizens of Germany.

4. Mr. Lippmann secured employment as an engineer at the Peoria Cordage Company, Peoria, Illinois on April 1, 1931, working on a special project. He resigned in May 1934 because the work for which he had been hired was completed. From the time of their marriage until they left the United States in 1934, the plaintiffs resided in Peoria, Illinois.

5. Mr. Lippmann's father, Moritz Lippmann, was a citizen of Germany and a resident of Chemnitz, Germany. He owned a furniture manufacturing and retail house in Chemnitz, the Moritz Lippmann Company, which consisted of a factory, a six-story retail store, and several branch stores. He and his wife visited the plaintiffs in Peoria, Illinois, in 1933 and at that time urged the plaintiffs to return to Chemnitz in order that the plaintiff, Moritz Walter Lippmann, could assume the management of the business. The father was growing old and was in poor health and, although he had two other sons, they were artisans without managerial experience; Walter was the eldest son and the only one trained for management responsibilities. The plaintiffs accepted this offer and left the United States on June 19, 1934.

6. At all times during their stay in the United States the plaintiffs had lived in rented rooms and apartments. Upon leaving the United States the Lippmanns gave up their apartment. Mr. Lippmann resigned from his employment at the Peoria Cordage Company, they gave their furniture to friends and the church, and they purchased one-way tickets to Germany.

7. The plaintiffs thereafter resided in Germany for fourteen years from 1934 to

1948. Upon his arrival in Germany Mr. Lippmann assumed the management of his father's business. He promised his mother that he would remain there for the rest of her life. The Lippmanns took an apartment, furnished it, acquired an automobile, and within a year after their arrival, built a large country residence. Mr. Lippmann acquired a 25% interest in his father's business, Moritz Lippmann Company, Chemnitz, and a 90% interest in another furniture manufacturing house, Krebs and Co. of Brand-Erbisdorf, Germany. He was a wealthy man in Germany with substantial industrial interests and with an annual income of $25,000 to $30,000. He joined the Nationalsozialistische Volkswohlfahrt (NSV—National Socialist Welfare Organization) and the Deutsche Arbeitsfront (DAF—German Labor Front), affiliated organizations of the Nazi Party.

8. The plaintiffs have two children, Wolfgang Walter Lippmann, born April 15, 1934 at Peoria, Illinois, and Ingeborg Winifred Lippmann, born February 17, 1938 at Chemnitz, Germany.

9. Plaintiffs resided in Germany continuously from 1934 to 1948. During that period they made one trip to the United States, arriving at New York on April 30, 1937 and departing for Germany on July 1, 1937. Upon leaving Germany for this trip plaintiffs purchased round-trip tickets on the Hamburg-American Line. They did not travel to the United States on this trip for the purpose of renewing their residence in the United States but solely for the purpose of securing renewals of their re-entry permits and for the purpose of concealing their United States assets from the German Foreign Exchange Control authorities as hereafter set forth.

10. Upon leaving the United States in 1934 plaintiffs had secured re-entry permits dated June 13, 1934 and valid for one year until June 13, 1935. These permits were extended for four six-months' periods by the United States Consulate at Dresden, Germany and the last extension expired June 13, 1937. While in the United States in 1937 plaintiffs secured new re-entry permits dated June 2, 1937 and valid for one year until June 2, 1938. Plaintiffs did not

secure extensions of these permits and they expired on June 2, 1938.

11. Pursuant to the German Foreign Exchange Control Laws (Devisen Laws) plaintiffs, as residents of Germany (Deviseninlanders), were required to report their foreign exchange holdings and could be required, upon demand, to surrender such assets to the Reichsbank in exchange for German currency. During the period of their residence in the United States prior to 1934 plaintiffs had accumulated the sum of $4,400, which they left in the United States upon their return to Germany in 1934. Plaintiffs desired to conceal these assets from the German Foreign Exchange Control authorities and, when in the United States in 1937, they borrowed the sum of $1,100 from the First National Bank, Peoria, Illinois, and purchased the premises described as: "Lot 15 in Block 3 in Table Grove Addition to Peoria situated in the City of Peoria, County of Peoria and State of Illinois," for the sum of $5,250. Thereafter the plaintiff, Moritz Walter Lippmann, executed a report in Germany of his foreign property holdings as required by the German Foreign Exchange Control laws and falsified the report in that he omitted to report the aforesaid real property.

12. The above premises were purchased by plaintiffs on June 17, 1937, and plaintiffs left the United States on July 1, 1937. During all of the time that plaintiffs owned the property, it was occupied by tenants, and was managed for plaintiffs by the First National Bank of Peoria. It was never occupied by plaintiffs.

13. Upon the commencement of hostilities in Europe in 1939 Moritz Lippmann Co. and Krebs and Co. turned to the production of war materials for the German armed forces, manufacturing ammunition cases and mattresses. The plaintiff, Moritz Walter Lippmann, was deferred from military service in the German armed forces as an essential worker.

14. When the Allied armies entered Germany at the beginning of 1945 the plaintiffs continued to reside at Chemnitz until the Russian army approached that

city. On February 17, 1945 they removed to Brand-Erbisdorf, Germany, and resided in that city until the Russian army again approached. Plaintiffs left Brand-Erbisdorf on May 5, 1945 and traveled west to Frankfort, Germany in the United States zone of occupation and resided there until February 1948. During that period the plaintiff Moritz Walter Lippmann was employed by the United States army. Plaintiffs filed applications for immigration visas dated February 10, 1948 and, upon the granting of said visas, left Germany and arrived in the United States on March 14, 1948. Since that time they have resided at Peoria, Illinois.

15. At all times from 1934 to 1948 the plaintiffs were residents within, and domiciled in, Germany, and maintained their principal place of abode in Germany, with the intent of making Germany their place of residence for an unfixed and unlimited time.

16. The property described in Finding No. 11 was purchased by the Plaintiffs on June 14, 1937, and Plaintiffs' title was evidenced by warranty deed from Laurence Farrelly and Nellie Farrelly to Moritz Walter Lippmann and Mathilde Josefine Lippmann, husband and wife, as joint tenants and not as tenants in common, dated June 14, 1937, and recorded in Book 491, Page 429, in the Office of the Recorder of Deeds of Peoria County, Illinois.

17. On October 4, 1943, the Alien Property Custodian, acting pursuant to authority conferred on him by the Trading with the Enemy Act, as amended, 50 U.S.C.A. Appendix, § 1 et seq., and Executive Order No. 9095, as amended, 50 U.S.C.A.Appendix, § 6 note, duly issued his Vesting Order No. 2323, filed with the Division of the Federal Register on November 11, 1943, and published in 8 Federal Register 15531 on November 13, 1943, vesting in himself the property described in Finding No. 11.

18. Thereafter, the Alien Property Custodian caused said property to be appraised by Montgomery Bros., realtors, of 407 Alliance Life Building, Peoria, Illinois, and on November 8, 1943 said property was valued by Montgomery Bros. at the sum of $4,500.

19. Thereafter, the Alien Property Custodian duly advertised said property for public sale by advertisements appearing in the Peoria-Journal Transcript on May 14, 15, and 16, 1944. Pursuant to said advertisements, bids were to be opened at ten o'clock A.M., May 30, 1944, at the offices of said Montgomery Bros., realtors.

20. In response to said advertisements for public sale, one bid was received from George Alfs in the sum of $3,100.

21. By Rejection Order No. 49, signed by the Alien Property Custodian on July 11, 1944, said bid was rejected by the Alien Property Custodian, and George Alfs was duly advised thereof.

22. Thereafter, pursuant to law, the Alien Property Custodian duly issued an order for private sale of said property and solicited private offers to purchase and, after negotiation, sold said property to George Alfs for the sum of $4,100, and conveyed said property to George Alfs by quit claim deed, dated November 6, 1944.

23. The vesting of said property by the Alien Property Custodian and sale to George Alfs was done pursuant to law and was, in all respects, legal and valid.

24. George Alfs died on or about December 31, 1947, and said property is now owned by his heirs, the defendants Courtland George Alfs and Dorothy Alfs Johnson.

25. By Executive Order No. 9788, effective October 15, 1946, 11 Fed.Reg. 11981, 50 U.S.C.A.Appendix § 6 note, the Attorney General succeeded to the duties and functions of, and property held by, the Alien Property Custodian. The defendant J. Howard McGrath, Attorney General, is the successor to the Alien Property Custodian.

### Conclusions of Law

1. This action was instituted by the plaintiffs to recover the real property described in Finding No. 11, supra, which was vested by the Alien Property Custodian and sold by him prior to the institution of this action, and which is now owned by the defendants, Courtland George Alfs and Dorothy Alfs Johnson. The jurisdiction of the Court is based upon Section 9(a) of

the Trading with the Enemy Act, as amended, 50 U.S.C.A.Appendix, § 9, which provides: "Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States, * * * may institute a suit in equity in the Supreme Court of the District of Columbia or in the district court of the United States for the district in which such claimant resides, or, if a corporation, where it has its principal place of business (to which suit the Alien Property Custodian or the Treasurer of the United States, as the case may be, shall be made a party defendant), to establish the interest, right, title, or debt so claimed, and if so established the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or the interest therein to which the court shall determine said claimant is entitled. If suit shall be so instituted, then such money or property shall be retained in the custody of the Alien Property Custodian, or in the Treasury of the United States, as provided in this Act, and until any final judgment or decree which shall be entered in favor of the claimant shall be fully satisfied by payment or conveyance, transfer, assignment, or delivery by the defendant, or by the Alien Property Custodian, or Treasurer of the United States on order of the court, or until final judgment or decree shall be entered against the claimant or suit otherwise terminated." In the instant case the property in question had been sold by the Alien Property Custodian before the institution of suit and the rights of these plaintiffs are therefore governed by Section 7 (c) of the Trading with the Enemy Act, as amended, 50 U.S.C.A.Appendix, § 7(c), which provides as follows: "The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him shall be that provided by the terms of this Act, and in the event of sale or other disposition of such property by the Alien Property Custodian, shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian or by the Treasurer of the United States." Pursuant to these provisions the rights of these plaintiffs are limited to an action to recover the proceeds of the property now held by the Attorney General, as successor to the Alien Property Custodian, and these plaintiffs have no right of action to recover the property now owned by the defendants Courtland George Alfs and Dorothy Alfs Johnson.

2. Section 9(a) of the Trading with the Enemy Act, as amended, 50 U.S.C.A. Appendix, § 9(a), grants a right of action against the Alien Property Custodian for the return of vested property or the proceeds thereof, in favor of "any person not an enemy or ally of enemy". Section 2(a) of the Trading with the Enemey Act, as amended, 50 U.S.C.A.Appendix, § 2(a), defines "enemy" as "any individual * * * resident within the territory * * * of any nation with which the United States is at war * * *." The plaintiffs herein were resident within Germany after December 11, 1941 and at the time of the vesting of the property in question and they are, therefore, enemies, within the meaning and intent of the Trading with the Enemy Act, as amended, and are ineligible to maintain an action for the return of their property, or the proceeds thereof, under the Trading with the Enemy Act.

3. Section 39 of the Trading with the Enemy Act, as amended, Act of July 3, 1948, 62 Stat. 1246, 50 U.S.C.A.Appendix, § 39, provides as follows: "No property or interest therein of Germany, Japan, or any national of either such country vested in or transferred to any officer or agency of the Government at any time after December 17, 1941, pursuant to the provisions of this Act, shall be returned to former owners thereof or their successors in interest, and the United States shall not pay compensation for any such property or inter-

est therein. The net proceeds remaining upon the completion of administration, liquidation, and disposition pursuant to the provisions of this Act of any such property or interest therein shall be covered into the Treasury at the earliest practicable date." At all times the plaintiffs herein have been and still are nationals of Germany and the return of their vested property or the proceeds thereof, or payment of compensation therefor is prohibited by law.

### Final Decree

It is ordered, adjudged and decreed that the complaint herein be dismissed upon the merits and that the defendants have judgment against the plaintiffs for costs.