Emma ECKER,

v.

The ATLANTIC REFINING COMPANY, a Pennsylvania corporation, Defendant, and United States of America and Herbert Brownell, Jr., Attorney General of the United States, as successor of the Alien Property Custodian, Intervenor-Defendant.

No. 6046.

United States District Court, D. Maryland, Civil Division.

Oct. 26, 1954.

Kenneth C. Proctor, Towson, Md., Francis D. Murnaghan, Jr., Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

Robert D. Bartlett, C. Damar McKenrick, Bartlett, Poe & Claggett, Baltimore, Md., for defendant Atlantic Refining Co.

George Cochran Doub, U. S. Atty., Baltimore, Md., Rowland F. Kirks, Special Atty. Office Alien Property Custodian, James D. Hill, Chief, Litigation Branch, Dept. of Justice, David Schwartz, Paul E. McGraw, Atty. Dept. of Justice, Washington, D. C., for intervenor-defendant.

CHESNUT, District Judge.

This case raises questions of administration in the office of the Alien Property Custodian under the Trading with the Enemy Act, 50 U.S.C.A.Appendix, §§ 1–40. For some years prior to 1943 the plaintiff and her husband had been owners of a lot of land in Towson, Baltimore County, Maryland, which, during the last world war was seized and later sold by the Alien Property Custodian to the defendant, The Atlantic Refining Company. The United States and Herbert Brownell, its Attorney General, who by Executive Order has succeeded the Alien Property Custodian, has intervened in defense of the attack on the administrative actions of the Alien Property Custodian.

The second amended complaint is in two counts, the first of which in substance asserts that the seizure and sale of the property was not legally sufficient to transfer title and ownership to the defendant, and the second count charges in effect that the Atlantic Refining Company as purchaser of the property was cognizant of the alleged defects in the power of seizure and sale and in bad faith connived with the Alien Property Custodian in the seizure and sale. The relief sought by the complaint is (1) a declaratory decree that the title to the property still remains in the plaintiff and (2) that the Atlantic Refining Company be required to pay to the plaintiff what she alleges to be the fair value of the property over and above the net proceeds of the sale made by the Alien Property Custodian which have heretofore been received by her from the Alien Property Custodian.

The original complaint in this case was filed September 9, 1952. Prior to the recent trial on the facts the matter has been before the court with extended hearings several times. On motions to dismiss the plaintiff was given leave to amend and on similar motions on the first amendment a second amendment was allowed. Finally the motions of the defendants to dismiss the second amended complaint were overruled without prejudice and the motion of the plaintiff for judgment on the pleadings was overruled. The case has now been heard on quite voluminous evidence, the main part of which, however, has by stipulation of counsel been reduced to narration of stipulated facts subject only to objections as to relevancy; but in addition there are a number of depositions and exhibits and other documents and the oral testimony of several witnesses heard in court. The principal and controlling facts with regard to the title to the property are briefly stated.

1. The plaintiff, Emma Ecker, was born in Austria in 1869 and while living there married Leopold Ecker who was born there in 1876. After their marriage they came to the United States in 1909 and were naturalized in 1921. The next year, 1922, they returned to Austria and bought a residence property in a suburb of Vienna and also nearby a 22-acre vineyard. Between 1922 and 1929 they made some temporary visits to the United States but over the period of seven years they lived for five and one-half years in Vienna. Emma Ecker never returned to the United States until 1951, shortly before this suit was filed. Her husband, Leopold Ecker, did make a few very temporary visits to the United States, the last one being in 1932. Thereafter he and his wife continued to live in their residence property near Vienna until his death in 1948. Leopold Ecker kept a shoemaker's shop in Towson, Maryland, prior to 1921. In 1914 he and his wife purchased the lot in Towson which is the subject matter of the controversy in this case. Before returning to Austria on his visit here in 1932 he made a ten year lease of this property to the St. Paul Realty Corporation, which lease was later assigned, with the consent of the lessor, to the Atlantic Refining Company. The Eckers gave a power of attorney to Frederick F. Schneider, who for many years before and afterwards was the German Consul in Baltimore. Some time before the first lease expired Schneider, as attorney for the Eckers, negotiated with the Atlantic Refining Company regarding a new lease but the correspondence with Ecker upon the subject was interrupted by the outbreak of war in December 1941, and Schneider shortly thereafter and under date of February 21, 1942, executed a new lease as attorney in fact to the Atlantic Refining Company. The new lease extended for a period of ten years with an option to renew for an additional five years. It also contained a provision that the lessee should have the right of "first refusal" of any sale price offered to Ecker by any one. Schneider as attorney collected the rental income less necessary expenses and forwarded the proceeds from time to time to Ecker, receiving for his services a commission of 5% of the rentals collected. After the

608

outbreak of war with Germany and Japan in December 1941 the Treasury Department notified the Atlantic Refining Company that the income from this property was "blocked". The Treasury Department had issued a license authorizing the new lease.

2. The Alien Property Custodian, upon learning of the ownership of the Towson property by the Eckers and having investigated their status under the Trading with the Enemy Act, seized the property as belonging to enemy nationals (within the definition of the Act) by a vesting order dated September 10, 1943, No. 2178 (Stipulation Ex. No. 5). This vesting order recited that the Eckers were "residents of Germany and nationals of a designated enemy country (Germany)," and that said property is "owned or controlled by nationals of a designated enemy country (Germany)"; and also that the national interests of the United States require that such persons be treated as nationals of the aforesaid enemy country (Germany) and that the vesting was "subject to recorded liens, encumbrances and other rights of record held by or for persons who are not nationals of designated enemy countries to be held, used, administered, liquidated or otherwise dealt with in the interest of and for the benefit of the United States."

3. In due course of administration the Alien Property Custodian determined to offer the property for sale at public auction and on May 24, 1944 the Safe Deposit & Trust Company of Baltimore was asked by the Custodian to act as his representative in conducting the sale. On June 12, 13, 14, 16 and 23 the property was advertised for sale in local papers. The advertisement stated that it was to be sold subject to a mortgage of $2,203, and that under the lease on the property "the lessee had the right of first refusal of any offer to the owners for the property". The highest bidder at that time was a Mr. George Kent, a restaurant proprietor in Towson who, however, refused to complete the sale on the ground that he could not secure an in-sured title policy on the property. After diligent efforts on the part of the Alien Property Custodian to have the purchaser complete the sale, it was finally cancelled by the Custodian on February 21, 1945. Thereafter the Custodian having first obtained a real estate appraisal of the property from Pierre C. Dugan & Nephew, well known realtors in Baltimore City, at $22,000, decided to accept the offer of the Atlantic Refining Company at that figure. The written acceptance by the Custodian was dated June 14, 1946 pursuant to the written memorandum of approval by the then Alien Property Custodian dated June 10, 1946, and further ratified and approved by formal written order for private sale dated July 11, 1946. Pursuant thereto the Alien Property Custodian executed a deed for the property to the Atlantic Refining Company upon receipt of the purchase price.

4. On July 29, 1948 Kenneth C. Proctor, of counsel for the plaintiff, filed a claim with the Alien Property Custodian as a result of which the net proceeds of the sale to the Atlantic Refining Company were subsequently paid to the plaintiff, the last payment having been made March 20, 1951. This payment was made by the Alien Property Custodian under the authority of section 32 of the Act which authorized the Alien Property Custodian in his discretion to pay the proceeds of any sales of property theretofore made by him to American Nationals even though their property had been theretofore seized and sold by the Alien Property Custodian as enemy nationals. This section of the Act was passed by Congress March 8, 1946 and subsequently amended from time to time, including 1952. The State Department determined in 1949 that the Eckers had not lost their American citizenship.

So far as the contention as to title to the property is concerned the only questions of law that need be considered upon the facts recited are—(1) whether the Alien Property Custodian had power and authority under the Act to seize and vest title to the property in 1943 and (2)

whether he had the power and authority in 1946 to make a private sale of the property, the prior public sale having failed.

The powers of the Alien Property Custodian under the Trading with the Enemy Act have so frequently been the subject of judicial consideration that practically all aspects of the matter have been heretofore determined by the courts. I have no doubt that the Alien Property Custodian did have full power and authority to seize and sell this property at private sale after the public sale had failed. As previously stated, the original complaint dealing largely with the title question was dismissed on motion with leave to amend and the motion to dismiss the second amended complaint was overruled without prejudice principally because, as stated at the time, there were averments of fraud and bad faith contained in the second count with respect to the actions of the Atlantic Refining Company which I thought the plaintiff should have full opportunity to establish by evidence if it existed.

A brief reference to the sections of the Act and the Executive Orders authorized thereby will be sufficient. By section 5(b) (1) it is provided:

"* * * any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe. Such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes; * * *."

The President's power under section 5(b) has been expressly delegated to the Custodian by Executive Order No. 9095, March 11, 1942, 7 Fed.Reg. 1971, as amended by Executive Order No. 9193, July 6, 1942, 7 Fed.Reg. 5205. (See also 50 U.S.C.A.Appendix, § 6 note, for the Executive Orders.)

By section 2 of the Act the word "enemy" is defined to include "(a) any individual * * * of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, * * *."

And by Executive Order No. 8389, April 10, 1940, 5 Fed.Reg. 1400, as amended by Executive Order No. 8785, June 14, 1941, 12 U.S.C.A. § 95a note, it was provided:

"E. The term 'national' shall include,

"(i) Any person who has been domiciled in, or a subject, citizen or resident of a foreign country at any time on or since the effective date of this Order, * * *

(iv) Any other person who there is reasonable cause to believe is a 'national' as herein defined."

By Executive Order No. 9095, March 11, 1942, as amended by Executive Order No. 9193, July 6, 1942, the President delegated his powers with respect to seizure, management and sale of property to the Alien Property Custodian. The powers conferred by Congress on the President were necessarily broad and sweeping and were passed in exercise of the war power to protect the vital interests of the United States. It will also be remembered that shortly before the outbreak of the second world war involving the United States in December 1941, Germany had overrun Austria and had occupied it militarily.

Viewed as a whole, the purpose and effect of the Trading with the Enemy Act as applicable here is that any property in the United States even though owned by a citizen of the United States resident within an enemy country (including Austria in this case) could be seized and vested by the Alien Property Custodian, and the sole remedy pro-

vided for an improper seizure was given by section 9(a) of the Act which provided that a claim might be filed by the owner with the Alien Property Custodian and suits could be brought against the Alien Property Custodian by the claimant for a return of the property. It is this provision of the Act which gratifies the constitutional requirement of due process. Becker Steel Co. of America v. Cummings, Attorney General, 296 U.S. 74, 56 S.Ct. 15, 80 L.Ed. 54.

■ Counsel for the plaintiff contends that the Alien Property Custodian was not justified in reciting in the vesting order that the Eckers were in 1943 enemy nationals as defined in the Act and the Executive Orders above referred to, but as the Custodian did in fact make this finding after investigation at the time, I know of no authority which would authorize a retrial of that issue of fact in this collateral proceeding. For the purposes of the case the finding is conclusive. Central Union Trust Co. of New York v. Garvan, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403; Kahn v. Garvan, 2 Cir., 263 F. 909; Commercial Trust Co. of New Jersey v. Miller, Alien Property Custodian, 262 U.S. 51, 43 S.Ct. 486, 67 L.Ed. 858. None of these cases involved a prior sale by the Custodian. All of them arose on a suit against the Custodian filed by the owners for a return of the property under section 9(a). Section 7(c) of the Act provides that the exclusive remedy of any individual whose property has been seized is to file a claim with the Custodian and if necessary a suit against him for the return of the property as provided in section 9(a) of the Act. No such claim was, however, filed by the plaintiff in this case and the present suit is not against the Custodian or the Attorney General of the United States or the United States, but against the purchaser of the property.

■ But in addition to the conclusive effect of the finding by the Custodian I also find as a fact from all of the evidence in this case that the plaintiff and her husband were residents of Austria and therefore enemy nationals within the meaning of the Act and the Executive Orders authorized by the Act. I shall not prolong this necessarily somewhat extended opinion by reviewing and appraising in detail all the voluminous evidence bearing upon the question of the Eckers' status as residents of Austria almost all the time from 1921 until the death of Leopold Ecker in 1948 and the final return of Emma Ecker to this country in 1951. I have heard all this evidence in court and carefully considered it at the time.

The scope and meaning of the term "resident" as contained in the Act is discussed in the opinion of Mr. Justice Frankfurter in Guessefeldt v. McGrath, 342 U.S. 308, 72 S.Ct. 338, 96 L.Ed. 342. The evidence here quite satisfies me that the status of the Eckers with respect to Austria from at least 1929 to 1948 was very close indeed to domicile. Certainly they were more than mere sojourners there or even visitors or temporary residents. Upon their return to Austria in 1922 they promptly bought a residence property, and a 22-acre vineyard, which continued to be their principal home for nearly 30 years. In 1939 Leopold Ecker made application for German citizenship, which, after investigation was recommended but not in fact consummated owing to what is said to have been a change in the German policy. Leopold Ecker also joined a public welfare association (NSV) and Emma Ecker joined the National Socialist Women's League, the women's auxiliary of the Nazi Party. I have not failed to consider the evidence offered by counsel for the plaintiff to the effect that on a number of occasions one or both of the Eckers expressed themselves to neighbors or relatives as being desirous of returning to the United States and to preserve their nationality here. Mrs. Ecker, although now living here, was unable to appear and personally testify owing to her age and impairment of physical and mental health. Viewing the evidence as a whole I think the actions of the Eckers can be more plainly found from what they did, than

from general hearsay expressions made by them from time to time. It is quite possible, as is indeed indicated by some of the correspondence, that Leopold Ecker was desirous of retaining his American citizenship if possible on account of tax advantages applicable to his income from the Towson property as compared with the tax thereon to an alien.

My impression from the evidence as a whole is that the Eckers never really intended to return to the United States and the fact that Mrs. Ecker did finally return three years after the death of her husband and only shortly before this suit was filed has little weight on the matter of their status as residents and enemy nationals during the recent war. The contention that they were only prevented by ill health and difficulties of travel during the war did not seem convincing to me when the evidence is considered as a whole. Certainly the Custodian's recital that they were enemy nationals at the time is based on a reasonable belief as provided for in the Executive Order above quoted.

Counsel for the plaintiff relies particularly on three decisions which he contends on the facts should determine the Eckers were not residents of Austria within the meaning of the Act and Executive Orders. They are Miller v. Sinjen, 8 Cir., 289 F. 388; Josephberg v. Markham, 2 Cir., 152 F.2d 644; Kaku Nagano v. McGrath, 7 Cir., 1951, 187 F. 2d 759, affirmed by equally divided court, 342 U.S. 916, 72 S.Ct. 363, 96 L.Ed. 685. I have carefully considered these cases but in my opinion the facts of the instant case are sufficiently different to require a contrary conclusion. None of these cases involved a sale by the Alien Property Custodian and the most recent was decided on motion to dismiss the complaint, and not after full trial of the case.

■ The Alien Property Custodian also had power and authority to sell the property at private sale after the highest bidder at the public auction had refused to complete the sale. Counsel for the plaintiff contends to the contrary on reference to section 12 of the Act which provides that ordinarily the sale of real property shall be at public sale after due advertisement unless the President, stating the reasons therefor, in the public interest shall otherwise determine. However, it appears from the Act and Executive Orders that the President with due authority did delegate the determination of this question to the Custodian by Executive Order No. 9095 above quoted. This is not disputed by counsel for the plaintiff who, however, contends that the President could properly have delegated it only to some one other than the Custodian. No authority has been cited in support of this contention and I know of none.

Counsel for the government say that private sales have very frequently been made by the Custodian; but while there are apparently only a few reported judicial decisions on the point, private sales have been upheld in at least two cases. United States v. Chemical Foundation, Inc., 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131, and Lippmann v. McGrath, D.C., 94 F.Supp. 1016. It is also to be noted that by section 12 of the Act the Custodian is given the power of a common law trustee in the management and disposition of property lawfully seized by him. And section 7(c) of the Act provides that where property has been sold by the Custodian the only remedy of the claimant is to secure from the Custodian the net proceeds of the sale. Becker Steel Corp. v. Cummings, supra. In the instant case the net proceeds of the sale of the property to the Atlantic Refining Company have been heretofore paid to the plaintiff, or at least there is no controversy here about that. If anything further is due on this account it could not be adjudicated in this case.

I conclude, therefore, as a matter of law that the plaintiff's property was duly seized and vested by the Custodian and thereafter duly sold to the Atlantic Refining Company as a result of which a good title was transferred to and vested in the defendant, and that the sufficiency

of this title cannot be further litigated in this suit against the purchaser.

I come now to the plaintiff's case as set up more particularly in the second count of the second amended complaint. The particular legal contention as more clearly defined and advanced in oral argument by counsel for the plaintiff is that the defendant did not get an absolute and good title from the Custodian because it was not purchased "in good faith". The approach to this argument seems to be based on the provisions of section 5(b) (2) of the Act, which states in substance and effect that actions taken by persons dealing with the Custodian in good faith upon reliance on Administrative Orders will be protected. The application of the section to the plaintiff's case here against the defendant seems rather doubtful on a reading of the section. It would appear to be more in the nature of a shield for defense than a sword for attack. But however that may be, on a consideration of the whole evidence I do not find that the Atlantic Refining Company acted in bad faith in making this purchase.

At the outset, on consideration of the effect of the evidence, it is necessary to understand what plaintiff's counsel means in attributing bad faith to the defendant. In the second count it is alleged in substance and effect (1) that the defendant really instigated and persuaded the Custodian to sell the property to it knowing that the plaintiff's property was not legally subject to seizure and sale, and (2) that the defendant conspired or connived with Schneider, the plaintiff's attorney in fact, to procure and induce the seizure and sale, both knowing that it was not lawful or justified. There was also the charge made in argument by counsel for the plaintiff that the representatives of the Custodian were likewise chargeable with fraud and connivance in the making of this sale. I will say at once that as a fact I find no evidence whatever in the case to indicate any improper action or motivation or favoritism of any kind whatever attributable to the government agency, and indeed I rather gathered that the charge against the government was not very seriously pressed in the case on the evidence. There is nothing in the evidence which indicates to me that the Custodian's office in selling this property to the defendant was at any time actuated or motivated by other than ordinary business judgment in the management of the property. Nor do I find any evidence or even any justifiable suspicion that Schneider was acting at any time other than in entire good faith in his relations with the Eckers or the Custodian or the defendant.

The plaintiff's principal complaint is that it was Schneider's duty to file on behalf of the Eckers a claim for the return of the property after it had been seized by the Custodian, and that his failure to do so constituted a breach of duty known to and participated in or induced by the defendant. It is not clear to me where he finds the existence of such a duty on the part of Schneider. It must be remembered that the property was seized by the Custodian in 1943 and apparently Schneider had not heard from the Eckers since 1941. It also appears that Schneider was quite aware of the problems that Ecker had with regard to American taxation and that in 1933 or 1934 Ecker had been advised by the American Authorities that in view of his long residence in Austria he would lose his American citizenship unless he returned to the United States for permanent residence. And even in 1940 when Ecker had applied to the American Consul in Austria for a passport to return to the United States, he had been advised that such a passport could be issued only upon his submitting proof of his intention to return to the United States for permanent residence. He never submitted such proof. It seems, therefore, entirely futile for counsel to suggest that Schneider knew that the Alien Property Custodian was without authority to seize the property and that it could and would be returned if he filed a claim for it on behalf of the Eckers. After 1941 and until early in 1946 correspondence be-

tween Ecker and Schneider was prevented by the war; but it was resumed in 1946 and the record contains several letters between them, between February and June 1946. It appears that early in 1946 Leopold Ecker had been informed that his Towson property had been sold at auction and asked information from Schneider about it. Schneider's replies clearly showed the exact situation as it then existed shortly prior to the private sale to the defendant. It appears from Schneider's letters that it was his understanding that the seizure by the Alien Property Custodian was lawful and that Ecker could not expect a return until further legislation. It also appears from Schneider's letter that he was in very bad health in 1946 and had been compelled to give up his downtown office. Schneider died in 1947. Plaintiff contends that it was the duty of Schneider upon learning of the seizure of the property by the Custodian to file a claim for its return to the Eckers, and that his failure to do so constituted a breach of trust. As already indicated I do not think this contention is well founded, but even if it could be said that Schneider negligently failed in a duty to the Eckers in that respect, there is no evidence in this case to show that the defendant in any way contributed thereto.

▆ And I find no evidence in the case to show that Schneider in any way sought to induce or to influence the Custodian in the seizure or disposition of the property. There is no sufficient evidence to show that the defendant ever sought to persuade or induce Schneider to take any action regarding the property with the Alien Property Custodian; or in fact that the defendant itself ever did seek to induce or influence the official action of the Custodian other than expressing a willingness to purchase it at a reasonable price.

The real heart of the plaintiff's case with respect to injury and for equitable consideration is the contention that the property was sold at private sale for much less than its fair market value at the time. The evidence does not sustain this contention. I find from the great weight of the evidence that the sum of $22,000 was a fair and reasonable price for this property when it was sold in June 1946. The evidence as to this seems to me to be quite convincing.

The property was subject to a still remaining 7 or 8 years lease to the Atlantic Refining Company, the net rental from which was about $1,400 per year. There is evidence in the case that 7½ to 10% would be a fair percentage for the capitalization of net income from such property. A capitalization of $1,400 at 7% would indicate about $20,000 as the fair price of the property based on its income production. In November 1943 the Custodian obtained through Schneider an appraisal of the property by W. C. Pinkard, a well known real estate appraiser in Baltimore. His appraisal was for $15,000 and he gave the reasons therefor as a witness in this case. Before the property was sold at private sale for $22,000 the Custodian obtained a further appraisal by Pierre C. Dugan & Nephew, well known realtors in Baltimore. The highest bid at the auction was submitted by one George Kent, a restaurant owner in Towson. It was for $35,000, less the outstanding mortgage of $2,303.70. The next highest bid was for less than $20,-000. Plaintiff's counsel places principal and indeed almost sole reliance upon this bid of Kent as evidence of the fair value of the property in 1946. But the whole evidence of value in the case satisfies me that Kent's bid was not a well considered one, and did not in any true sense reflect the then value of the property. Kent as a witness said that he had given no consideration to the effect of the lease on the property but had relied solely on the advice of a real estate broker in Towson. The latter also testified in effect that he thought the price was reasonable, but on consideration of his evidence I do not find it convincing. He attended the public auction and heard the several bids and a witness for the defendant, also present at the time, testified that the great disparity in the highest and next highest bid was noticeable

and that he talked with Kent's broker who stated that he thought his client, Mr. Kent, had made a foolish bid. This latter testimony was not contradicted by the broker except to the extent that on prior cross-examination he said he had not recalled talking with the defendant's representative at the time. As already stated, Kent refused to complete the sale assigning as his reason therefor that he could not obtain a policy of title insurance without an exception to the effect that the insurer would not be liable in the event of the possible prior death of the Eckers and the devolution of the title to one or more grandchildren of the Eckers who were American citizens residing in Maryland. The public sale offering was in 1944, more than a year before the ending of the war with Germany, and it does not appear that any one in the United States had received any word from the Eckers for some years before. Consequently it was not then known as a fact whether either or both of them had died, although it apparently was known that they were both aged and to some extent had impaired health.

When the private sale was made to the defendant in 1946 it accepted a title policy with such an exception. Schneider was at that time aware from recent letters from Ecker that both he and his wife were living but I do not recall any affirmative evidence that the defendant was so informed. Even if it had been, I do not think that constituted bad faith on the part of the defendant. The sale to the defendant had been made by the acceptance of its offer, on June 14, 1946, although the deed was not delivered until July 29, 1946. The subsequent consummation of the prior sale does not show any bad faith on the part of the Alien Property Custodian.

On the evidence counsel for the plaintiff makes much of the fact that when the Custodian seized and vested the property in 1943 he asked Schneider to represent the Custodian in the continued local management of the property, that is, the collection of rents and payment of necessary expenses; but it also seems plausible as stated by counsel for the government that this was merely pursuant to the policy and practice to retain for local management the person who previously had been familiar with the property. It also appears that Schneider was directed to report directly to a Mr. Haley, and another in the Custodian's office, and there is nothing whatever to show that Schneider at any time had anything whatever to do with advising the Custodian as to the disposition of the property. Schneider received a very modest compensation of only 5% of the gross income for his local management of the property. There is no evidence that the appointment of Schneider to represent the Alien Property Custodian was in any way suggested or advised or sought by the defendant, or even that the defendant knew of the Custodian's appointment of Schneider until after it had been made by the Custodian.

I also understood counsel for the plaintiff to advance, as a badge of fraud on the part of the defendant, that it had requested Schneider to act as its representative in the bidding at the public auction in 1944. However this seems to be a mistake as to the evidence. It does appear that before the actual announcement of the public sale the defendant wrote to the Custodian to inquire if it would be proper for it, if a public sale was held, to ask Schneider to represent the defendant in submitting its bid, to which the Custodian replied that if and when a public sale was held the defendant could appoint any representative that it desired. In this connection it should be remembered that the Atlantic Refining Company has many filling stations in the eastern States but apparently the one at Towson was the only one affected by the Trading with the Enemy Act. For general property acquisition and management of its filling stations the defendant had as its agent a Mr. Brick whose main office was somewhere in Pennsylvania. A reasonable inference for the inquiry of the Custodian by Brick was to avoid the necessity of his

personal attendance in Baltimore at the time of the submitting of the bids. However, as a matter of fact the defendant did not in fact ever request Schneider to represent it at the public sale and Mr. Brick himself did attend although, mistaking the exact hour, he arrived too late to submit the bid at that time.

These two instances with regard to Schneider seem to be the main if not the only badges of fraud urged by the plaintiff as evidence of bad faith. On the whole evidence I do not find that either or both constitutes any bad faith on the part of the defendant. On the contrary I find that the defendant acted throughout in good faith openly as a prospective purchaser of the property, and in its negotiations for the purchase both with Schneider as attorney for the Eckers prior to the seizure by the Custodian, and in the subsequent negotiations between the defendant and the Custodian, there was no misrepresentation or concealment on the part of the defendant, but that both parties at all times acted fully as possible seller and buyer "at arm's length". The plaintiff delayed in bringing this suit for about six years after the private sale to the defendant. In the meantime Schneider died in 1947 and Haley of the Custodian's office has also died. The Alien Property Custodian at that time is no longer in office.

Plaintiff's counsel also complains that his letter of inquiry dated July 11, 1946, which was after the private sale had been made but before the deed had been executed, was not answered by the Custodian until October 14, 1946. His contention in this respect is that if he had known of the sale before the deed had been delivered on July 29, 1946, claim would have been filed which would have stopped the transaction. The suggestion is that the answer which gave them the information as to the prior sale was intentionally delayed in order to prevent the filing of a claim for the restoration of the property. The delay in answering the letter was clearly explained by Mr. Nickerson of the real estate department of the Custodian's office. On July 13,

1946 he acknowledged receipt of Mr. Proctor's letter and advised him that it had been referred to the legal division of the Agency for reply. The delay of the legal department in replying to it was due to the enormous amount of correspondence then being handled by the legal department. Congress had recently passed the Act constituting section 32 of the Act, and this had caused very many inquiries from persons seeking the relief thereby afforded. The Act was originally passed on March 8, 1946, and amended August 8, 1946. Furthermore an examination of Mr. Proctor's letter of July 11th and the reply of October 14th do not justify the inference of intentional delay or fraud at any time. The letter of July 11th was not a claim for restoration of the property but merely requested information about the status of the property and the rents collected therefrom "so that I will be in a position to advise my clients". The letter also stated that the Eckers were "presently residents of Austria". The reply of October 14, 1946 fully informed Mr. Proctor of the then status of the property and of the possible rights of the Eckers to receive the net proceeds of the sale and enclosed forms for filing a claim for that purpose; but it was not until July 29, 1948 that further action was taken on behalf of the Eckers by filing a claim with the Custodian. There is no evidence to show or even suggest that the Custodian's delay in replying to Mr. Proctor's letter was either induced or contributed to or known to the defendant.

Plaintiff's counsel also criticizes Schneider for not making a better bargain on the Eckers' behalf in the matter of the second lease executed in 1942, and in expressing to Ecker his, Schneider's, view that it would be advisable for Ecker to accept the lessee's offer of $22,-000 or $25,000 for the property which Ecker declined, as he wanted $28,000 or $30,000, which the defendant was unwilling to pay. Ecker's basis for asking $30,000 for the property was apparently due to the fact that in the original lease

of 1932 with the St. Paul Realty Corp., there was a provision that the lessee should have the option to buy the property at $32,000 during the first five years of the lease, and at $35,000 during the second five years. Of course this option to the St. Paul Realty Corp. in no way constituted any opinion of the defendant, the assignee of the lease, as to the value of the property. The new lease of 1942 contained a provision that the lessee should have the "first refusal" at the price of a bona fide offer from some one else, but no figure for optional purchase. In consequence of the latter provision the Custodian, before cancelling the public sale at which the highest bid was that of Mr. Kent for $35,000, inquired from the defendant whether it was willing to pay that price, but the defendant refused to do so.

The present theory of the plaintiff as more particularly developed in the oral argument in response to questions from the Bench, seems to be that as the government, pursuant, I understand, to the usual practice, gave the defendant only a quitclaim deed, therefore the defendant took no better title than the government and that the defendant was aware of facts which gave it knowledge that it did not have a perfect title from the government; and in consequence the plaintiff is entitled to a declaratory decree that the defendant holds beneficial title to an interest in the property only to the extent that it should be reimbursed for the purchase price of the property, $22,000, with an accounting with respect to interest and rentals due under the lease since July 29, 1946; or, more shortly stated, that the effect of the whole matter is that the defendant now has title to the property only as lessee and beneficial ownership in the fee only to the extent of reimbursement for the purchase price with adjustment of rents, interest and expenses.

Counsel have not cited, and I know of no legal authority which supports their legal theory in this case. Nor have I been able to find any judicial decision which will justify a retrial of the title

to the property which has been lawfully seized and subsequently sold by the Alien Property Custodian. A holding to the contrary would manifestly cast a cloud upon the title to many pieces of property which have been seized and sold during and in consequence of the last war. I find no authority to support the proposition that the title to the purchaser from the Alien Property Custodian can be litigated in a suit not against the United States but against the purchaser. The only case that I have been able to find presenting a somewhat similar attempt to retry a title question in a suit against the purchaser is Lippmann v. McGrath, Attorney General, D.C.Ill., 1950, 94 F.Supp. 1016, where the district judge held to the contrary. It was pointed out there, as heretofore in this case, that the only remedy of the owner of the property which has been seized by the Alien Property Custodian is against the Custodian and not against the purchaser.

An alternative remedy sought by the plaintiff is a decree for damages against the defendant, on the plaintiff's theory and contention that it fraudulently conspired and combined with Schneider, and possibly some one in the office of the Alien Property Custodian, to set in motion a chain of events which would unjustly deprive the plaintiff of valuable property rights to her damage. There seems also to be interwoven in the argument of counsel for the plaintiff the idea or contention that the Trading with the Enemy Act must be so interpreted and applied that property should not be taken for public use without just compensation in view of the provisions of the Fifth Amendment to the Constitution. This contention, however, fails on the evidence in the case as I have concluded that the plaintiff has not shown fraud, conspiracy or deceit or unfair dealing by the defendant either with Schneider or the office of the Alien Property Custodian. Nor do I find that the plaintiff had not received fair and just compensation for her property as she has received the net proceeds of the purchase price of

$22,000, which I find by the weight of the evidence was a fair and reasonable price for the property at the time. That the property may now, six years later, possibly have a somewhat higher value is, of course, quite irrelevant.

For these reasons I conclude that the complaint must be and it is this 26th day of October, 1954, dismissed.